Receipt #062379

ORIGINAL

ECF

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FILED
FEB 2 4 2005
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NYCAL OFFSHORE DEVELOPMENT CORPORATION, Plaintiff, | ) | No. 05-249C |
| v | ) | (Judge ______) |
| THE UNITED STATES, Defendant. | ) | |

**NYCAL OFFSHORE DEVELOPMENT CORPORATION'S ORIGINAL COMPLAINT**

## I. INTRODUCTION

1. The United States has exclusive jurisdiction, control and the power of disposition over the submerged lands on the outer continental shelf that extend beyond state-owned submerged lands (the "OCS"). The Outer Continental Shelf Lands Act ("OCSLA") grants the United States the discretion to lease these OCS lands for oil and gas exploration and development. As the Supreme Court recently held in a case involving OCS oil and gas leases offshore North Carolina, once the United States sells such leases "its rights and duties therein are governed generally by the laws applicable to contracts between private parties." *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000). The Court held that the United States commits a material breach of OCS leases if it fails to carry out its contractual obligations in a "timely and fair" manner or if, in processing a lessee's request for a necessary governmental approval, it "deviates significantly" from the "procedures and



3619751v5 125507/00002

standards" in effect when the lease was issued, in a manner that results in a "substantial" delay in or interference with the lessee's exploration and development of the leases. *Id.* at 620-21.

2. In *Mobil Oil,* the Court held that a post-leasing federal statute, the Outer Banks Protection Act ("OBPA"), constituted a "repudiation" of the North Carolina OCS leases, entitling the lessees to rescind the contracts and obtain restitution of the bonuses they had paid, because the statute imposed new conditions that would substantially delay exploration and development of those leases. *Id.* at 621 ("Government's communication of its intent to commit that breach [in the OBPA] amounted to a repudiation of the contracts."). In so holding, the Court examined the terms of the North Carolina leases, which provided that the lease

> is issued subject to the Outer Continental Shelf Lands Act [OCSLA]; Sections 302 and 303 of the Department of Energy Organization Act, 91 Stat. 578, 42 U.S.C. 7152 and 7153; all regulations issued pursuant to such statutes and in existence upon the effective date of this lease; all regulations issued pursuant to such statutes in the future which provide for the prevention of waste and the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

Construing this provision, the Supreme Court held:

> The lease contracts say that they are subject to then-existing regulations and to certain future regulations, those issued pursuant to OCSLA and §§ 302 and 303 of the Department of Energy Organization Act. This explicit reference to future regulations makes it clear that the catchall provision that references 'all other applicable . . . regulations'. . . must include only statutes and regulations already existing at the time of the contract, . . . a conclusion not questioned here by the Government. Hence, these provisions mean that the contracts are not subject to future regulations promulgated under other statutes, such as new statutes like [the Outer Banks Protection Act]. *Id.* at 616.

3. This Suit relates to 3 undeveloped OCS leases located offshore California (the "Leases") in which the Plaintiff owns a partial interest. These Leases were purchased from the

United States by Plaintiff's predecessors in interest, and all exploration and development activities, as well as all regulatory matters, are conducted by Plaintiff's unit operator, Samedan Oil Corporation. This lawsuit arises because, as in *Mobil Oil,* the Government has failed to process Plaintiff's request for certain necessary approvals in a "timely and fair" manner, and has instead "deviated significantly" from the "procedures and standards" in effect when the Leases were acquired, in a manner that has resulted in a substantial delay of operations.

4. Specifically, the Government breached the Leases in the following manner. First, amendments to the Coastal Zone Management Act, 16 U.S.C. §§ 1451 *et seq*. ("CZMA"), enacted years after the Leases were issued, were held for the first time in *California v. Norton*, 150 F. Supp.2d 1046 (N.D. Cal. 2001), to require the cessation of all operations under the Leases unless and until the Government determines that lease "suspensions," which extended the life of the Leases and were issued in November 1999, were consistent with the State of California's coastal management program. Second, even though the Government did not seek a stay of the court's decision in *California v. Norton,* the Government has failed, and continues to fail, to conduct the consistency determination required by the court. The application of the amended CZMA to the Leases, and the Government's inaction have resulted in substantial delays in, and potentially a complete bar to, further exploration and development of the Leases. Plaintiff accordingly seeks the award of restitutioriary, reliance or expectation damages, whichever is greater, as a result of the Government's material breach of the Leases.

## II. PARTIES

5. Plaintiff Nycal Offshore Development Corporation ("Nycal") is a corporation organized under the laws of Delaware. Nycal's principle place of business is in London,

England. Nycal's activities include exploring and producing crude oil and natural gas. Nycal has an ownership interest in three OCS Leases, numbered OCS-P 460, OCS-P 462, and OCS-P 464.

6. The defendant is the United States of America ("United States" or "Government").

## III. JURISDICTION

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1491.

## IV. FACTUAL BACKGROUND

### A. The OCS Leasing Process

8. The OCSLA, 43 U.S.C. §§ 1301 *et seq.,* confers on the United States jurisdiction, control and the power of disposition over the mineral resources found in the subsoil and seabed of the OCS.

9. Under the OCSLA, 43 U.S.C. § 1337(b), the Secretary of the Interior ("Secretary") is empowered to sell leases that "entitle the lessee to explore, develop and produce the oil and gas within the leased area, conditioned upon due diligence and approval of the development and production plan required by" § 1351. Lease terms therefore grant a lessee the "exclusive right and privilege to drill for, develop, and produce oil and gas resources," in exchange for an up-front bonus and annual rentals. The Secretary has delegated most of his or her authority under the OCSLA to the Minerals Management Service of the Department of the Interior ("MMS"). 43 U.S.C. § 133 7(a).

10. MMS has divided the OCS into a number of planning areas for purposes of oil and gas leasing, including the Pacific Region. The Pacific Region consists of the Washington, Oregon, Northern California, Central California and Southern California Planning Areas.

11. All OCS planning areas are subdivided into blocks (usually three miles square) containing approximately 5,760 acres. An OCS oil and gas lease usually, but not always, covers a single block.

12. After the Secretary has adopted an OCS oil and gas leasing schedule required by 43 U.S.C. § 1344, he or she may commence the analysis and consultation required to conduct a sale of OCS leases within one of the planning areas included on the five-year schedule. Pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.,* MMS prepares an Environmental Impact Statement ("EIS") which considers the environmental impacts of the sale, as well as subsequent exploration and production activities in the area proposed for leasing, and alternatives to the proposed sale. Publication of a final EIS is normally preceded by public hearings and is subject to public comment regarding the proposed OCS activities.

13. After reviewing the final EIS, the Secretary determines whether to publish a proposed notice of sale, which identifies the blocks made available for leasing in a particular planning area, proposed bidding systems, lease terms, and other pertinent information. Governors of affected states, as well as executives of affected local governments, then have the opportunity to make recommendations regarding the proposed OCS lease sale. Under 43 U.S.C. § 1345(c), the Secretary is required to accept a Governor's recommendations if the Secretary determines, after providing an opportunity for consultation, that they provide for a reasonable balance between the national interest and the well-being of the citizens of the affected state. The Secretary is required to communicate to the Governor, in writing, the reasons for his or her

determination to accept or reject the Governor's recommendations or to implement any alternatives identified in consultation with the Governor that will provide for a reasonable balance between the national interest and the well-being of the citizens of the affected state.

14. If the Secretary decides to proceed with an OCS lease sale, a final notice of sale is published, specifying the date, time and place of sale, the blocks available for lease, lease terms, bidding requirements, and other pertinent information. No fewer than 30 days after publication of the final notice, MMS conducts the sale and opens sealed competitive bids.

15. The Secretary is authorized to grant OCS leases only to the highest responsible qualified bidders, 43 U.S.C. § 1337(a), although he or she reserves the right to reject any and all bids. Upon acceptance of a high bid and payment of the full cash bonus and first year's rental, the United States issues a lease to the successful bidder or bidders. All money received pursuant to OCS lease sales is deposited in the Treasury of the United States. 43 U.S.C. § 1338.

16. According to their terms and applicable federal regulations, OCS leases run for a fixed period of either five or ten years ("primary term") and "as long [thereafter] as oil or gas is produced from the lease in paying quantities, or drilling or well reworking operations as approved by the Secretary [of Interior] are conducted." 30 C.F.R. § 256.37. A lease that is not producing oil or gas in paying quantities within its primary term, or on which approved drilling or well reworking operations are not being conducted within the primary term, expires and reverts back to the Government unless MMS extends the lease beyond its initial period by virtue of a "suspension." MMS can extend a lease either by granting a lessee's request for a suspension or directing a suspension on its own initiative. *Id.* § 256.73(a) & (b). In either case, the lease does not expire as long as the suspension remains in effect. *Id.*

17. A lessee is not typically prohibited from conducting exploratory or pre-preduction activities during the period of a lease suspension. To the contrary, one of the principal reasons that lessees seek suspensions is to keep the leases from expiring while they conduct such activities, for example, drilling a well or conducting shallow hazard or bottom surveys. Accordingly, MMS is authorized to grant a lease suspension if it determines that the suspension would allow for the proper development of the lease. *Id.* at § 250.174(a).

**B. The Exploration and Production Process and State Participation.**

18. After purchasing a lease, an OCS lessee may submit an exploration plan ("HP") to MMS for its approval. Under the OCSLA, 43 U.S.C. § 1340(c)(1), the Secretary "shall" approve an EP within 30 days of its submission unless he or she determines: (1) that activities proposed under the EP would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral, to the national security or defense, or to the marine, coastal, or human environment; and (2) that the proposed exploration activities cannot be modified to avoid such probable serious harm or damage. If an EP is disapproved under 43 U.S.C. § 1340(c)(l) and a lessee is thereby deprived of its right to explore for oil and gas, the United States is required to pay the lessee the lesser of the fair value of the lease or the lessee's costs in acquiring and exploiting its lease, with interest from the date such costs are incurred. 43 U.S.C. §§ 1334(a)(2)(C); 1340(c)(l).

19. If warranted by exploration, an OCS lessee prepares and submits to the Secretary a development and production plan ("DPP"). 43 U.S.C. § 1351. The plan must describe the facilities the lessee will construct and employ and the operations the lessee will undertake in connection with its proposed activities, 43 U.S.C. § 135 1(a) & (c). Furthermore, the plan must set forth the environmental safeguards the lessee will put in place in developing and producing

oil or gas from the lease(s). 43 U.S.C. § 135 1(a) & (c)(3). The Secretary may disapprove a DPP if, *inter alia,* the Secretary determines that implementation of the plan would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral deposits (in areas leased or not leased), to the national security or defense, or to the marine, coastal or human environments, the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time, and the advantages of disapproving the plan outweigh the advantages of development and production. 43 U.S.C. § 135 l(h)(1)(D). If a plan is disapproved for this reason, then upon expiration of five years or at an earlier time upon request of a lessee, the Secretary shall cancel the lease and the lessee shall be entitled to receive the fair value of the lease or the lessee's costs in acquiring and exploiting its lease, with interest from the date such costs are incurred. 43 U.S.C. §§ 1334(a)(2)(C); 1351 (h)(2)(C).

20. First enacted in 1972, and amended in 1976 to deal explicitly with OCS - related activities, the Coastal Zone Management Act ("CZMA"), 16 U.S.C. §§ 1451 *et seq.,* provides for state participation in certain activities affecting its coastal zone. Under Section 307(c)(3) of the Act, 16 U.S.C. § 1456(c)(3), a state is allowed to review activities proposed by a lessee in an HP or DPP, to the extent such activities affect land or water uses in the coastal zone of that state, to determine whether they are consistent with the state's federally-approved coastal management program ("CMP"). If a state enters a consistency objection within the period specified by 16 U.S.C. § 1456(c)(3), no further exploration or development activities are permitted unless the Secretary of Commerce reviews that objection and overrides it by concluding either that the proposed activities are consistent with the objectives of the CZMA, or are otherwise necessary in the interests of national security. *Id.*

21. Under Section 307(c)(1) of the Act, 16 U.S.C. § 1456(c)(l), the Government must also conduct certain of its own activities in a manner consistent to the maximum extent practicable with the state's CMP. For those activities, a federal agency must provide a state with either a "consistency determination" that the proposed activity will take place "in a manner consistent to the maximum extent practicable with the enforceable policies of the state's approved management program," or a so-called "negative determination" that the activity will have no coastal effects (collectively, a "CZMA (c)(1) determination"). 15 C.F.R. §§ 930.34, 930.35(d), 930.39(a). "Final federal action" on federal activities that are subject to the CZMA Section 307 (c)(1) process cannot take place sooner than 90 days after the federal agency has notified the state of its consistency or negative determination, unless the state concurs in the determination, is deemed to have concurred under 15 C.F.R. § 930.41, or an alternative period is mutually agreed by the agency and the state. *Id.* at § 930.41(c).

22. At the time that the Leases were issued, Section 307(c)(1)(A) of the CZMA provided that only federal activities that "directly affected" the state's coastal zone were subject to the Section 307(c)(l) process:

> Each Federal agency conducting or supporting activities *directly affecting* the coastal zone shall conduct or support those activities in a manner which is consistent, to the maximum extent practicable, with approved State management programs.

(emphasis added).

23. In 1990, Congress amended Section 307(c)(l)(A) to read (additions are italicized; deletions are bracketed):

> Each Federal agency [conducting or supporting activities directly affecting] *activity within or outside the coastal zone that affects any land or water use or natural resource of* the coastal zone shall [conduct or support those activities] *be carried out* in a manner which is consistent, to the maximum extent practicable, with *the*

> *enforceable policies* of approved State management programs. *A Federal agency activity shall be subject to this paragraph unless it is subject to paragraph (2) or (3).*

24. The 1990 CZMA Amendments were intended to reverse the Supreme Court's decision in *Secretary of Interior v. California,* 464 U.S. 312 (1984), that the act of issuing OCS leases was not subject to CZMA's requirements because they did not "directly affect" the state's coastal zone. The 1990 CZMA amendments were intended to "make clear" that the sale of oil and gas leases is subject to the CZMA. H.R. Rep. 101-964 at 2676 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1,6.

**C. The California OCS Leases.**

25. This lawsuit involves 3 undeveloped OCS oil and gas leases: OCS-P 460, 462, 464, (collectively, the "Leases"). Plaintiff's predecessors in interest acquired the Leases in Lease Sale No. 68. After complying with the pre-lease sale requirements set forth above, Lease Sale No. 68 was conducted in June 1982, and leases were issued to successful bidders effective August 1, 1982. Each of the Leases has a primary term of five years and then as long thereafter as oil or gas is produced in paying quantities. Nycal possesses a 4.25313% interest in each of the Leases.

26. The original lessees made substantial cash bonus payments and annual rental payments for these leases. Plaintiff's affiliate and immediate predecessor in interest, Nycal Corporation, purchased the interest with common stock valued at over 3.8 million dollars at the time of sale. Subsequently, Plaintiff has expended considerable additional sums to maintain the leases.

27. All of the leases were issued on standard forms with additional stipulations. These Leases were entered into "by and between the United States of America (hereinafter called

the 'Lessor')" and the lessee. Section 2 of the Leases provides (as did the leases at issue in *Mobil Oil,* that:

> The Lessor hereby grants and leases to the Lessee the exclusive right and privilege to drill for, develop, and produce oil and gas resources, except helium gas, in the submerged lands of the Outer Continental Shelf described [herein].

Section 1 of the Leases provides (as did the leases at issue in *Mobil Oil),* that they are –

> issued subject to the [OCSLA]; all regulations issued pursuant to the statute and in existence upon the Effective Date of this lease; all regulations issued pursuant to the statute in the future which provide for the prevention of waste arid the conservation of the natural resources of the Outer Continental Shelf, and the protection of correlative rights therein; and all other applicable statutes and regulations.

28. MMS regulations permit lessees to join their separate leases into units for the purpose of joint development, under formal "unit agreements" that must be approved by MMS. 30 C.F.R. § 250.1301. The Leases at issue were organized into the Gato Canyon unit, with Samedan Oil Corporation designated as the "operator" of this unit.

**D. The United States' Post-Lease Amendment of the CZMA and Refusal to Make a Section 307(c)(l) Determination for the Lessee's November 1999 Suspension Requests.**

29. Each of the Leases is beyond its five-year primary term, and thus can continue to exist only by reason of suspensions. MMS has extended the terms of the Leases by granting suspensions on a number of occasions – first at the request of the lessees and then, beginning in October 1992, at the direction of MMS. MMS directed the October 1992 suspension in order to conduct its California Offshore Oil and Gas Energy Resources ("COOGER") study concerning the status and future of oil and gas development offshore California. MMS proposed the study as a means to "assist MMS in considering future exploration and development plans under its regulations and satisfy information needs that [Ventura, Santa Barbara and San Luis Obispo]

Counties have expressed over the past several years." MMS termed the COOGER study "a key step leading to the future development of discovered oil and gas resources offshore California." MMS requested that the lessees participate in, and provide the majority of the funding for, the study. The lessees acceded to that request.

30. MMS had informed the lessees that the COOGER study would take only three years. However, it took MMS over two years simply to retain a contractor to conduct the study. The final COOGER report ultimately was not issued until seven years after MMS had first contacted the lessees about the project. Although the COOGER process was intended to "alleviate certain issues and concerns held by" the counties, the counties concluded that the report did not "satisfy county objectives."

31. In December 1998, after extending its directed suspension on several occasions as a result of the delay in the COOGER study, MMS informed the lessees that the directed suspension would terminate on August 16, 1999, and instructed them to submit additional suspension requests by May 15, 1999. MMS directed that these suspension requests set forth a schedule of activities leading to additional exploration or the commencement of production, with measurable milestones demonstrating physical activity on the Leases.

32. By May 15, 1999, Samedan Oil Corporation submitted suspension requests for the Leases. Each of the suspension requests detailed the additional activities that the lessees intended to undertake to lead to further exploration or production on them. To provide more time to consider the lessees' requests, MMS on August 13, 1999, directed suspensions for leases OCS-P 460 and OCS-P 464. In its August 13, 1999 letters, MMS purported to deny the suspension requests with respect to OCS-P 462, a decision that has been challenged by administrative appeal to the Interior Board of Land Appeals. If the administrative appeal is

successful, OCS-P 462 will be reinstated and would have been subject to the November 1999 suspensions described below.

33. On November 12, 1999, MMS granted the request for additional suspensions for the Leases (the "November 1999 suspensions"). MMS granted the suspension requests pursuant to 30 C.F.R. § 250.110(a)(l)(1999), which authorizes MMS to grant lease suspensions "to facilitate proper development of a lease including reasonable time to construct production facilities."

34. In the November 12, 1999 suspension letters, MMS imposed certain "milestones" that the lessees were required to meet. MMS informed the lessees that "[m]eeting these milestones is a critical factor in our determination of whether the suspension continues, or whether potential future requests for suspension are granted."

35. On November 15, 1999, the State of California filed suit against the Secretary of Interior alleging, *inter alia,* MMS did not have the authority to grant the November 1999 suspensions without first determining, in accordance with the CZMA Section 307(c)(l) process, that those suspensions would be consistent with California's coastal management program. Samedan Oil Corporation, as unit operator of the Gato Canyon Unit, intervened as a defendant along with the operators of other offshore unit agreements. Both the Government and the lessee intervenors contested the State of California's argument before the district court. On June 20, 2001, the district court held that, as a result of the 1990 CZMA Amendments, the lease suspensions were subject to the Section 307(c)(1) process. In doing so, the court made clear that its holding was based on those amendments:

> Because [under the 1990 Amendments] oil and gas leases must now be found to be consistent with the State's coastal management program at the time that they are sold, the Court finds that the granting of [the November 1999 suspensions] . . . must likewise be



3619751v5 125507/00002

> subject to a consistency determination as a federal activity affecting the coastal zone, as defined by the CZMA.

*California v. Norton,* 150 F. Supp.2d at 1053.

36. The court stated that its finding was "bolstered by the fact that the lessees must engage in certain milestone activities, including the spudding of delineation and exploratory wells, in order to continue the suspensions." *Id.*

37. Accordingly, the court ordered MMS to "provide the State of California with a determination that its grant of the lease suspensions at issue here is consistent with California's coastal management program." *Id.* at 1057. The Court directed MMS to set aside the November 1999 suspensions, and to direct suspensions of the Leases, *including all milestone activities,* "for a time sufficient for it to provide the State of California with a consistency determination [with respect to the November 1999 suspensions] in compliance with CZMA § 1456(c)(l) and its implementing regulations." *Id.* at 1057-58.

38. In compliance with the district court's order, MMS on July 2, 2001, set aside its approval of the November 1999 suspensions and directed a suspension of operations for the Leases until MMS "has acted on" the Lessees' suspension requests.

39. Complying with the district court's order and MMS' instructions, the Gato Canyon lessees have not conducted any further operations on the Leases since June 20, 2001. Upon learning of the court's decision in *California v. Norton,* Samedan was forced – at a considerable expense – to instruct a contractor who was transporting equipment to California to be used in MMS-approved preparatory exploratory activities to reverse course and return to Houston, Texas, because no further activities could take place on the Leases prior to MMS' issuance of its Section 307(c)(l) determination.

40. In letters dated July 16, 2001, MMS informed the unit operators that the agency would be reviewing the November 1999 suspension requests "over the next several weeks" to determine whether their approval would have coastal effects. MMS stated that "[w]hen completed, we will submit our determination to the California Coastal Commission." Noting that under 15 C.F.R. § 930.41, absent an agreement with the state, the federal agency must not take final agency action less than 90 days after the state's receipt of that determination, MMS informed the operators that it might be able to act on the suspension requests as early as December 2001. The December 2001 date, coupled with the 90-day requirement, indicated that MMS was planning to issue either a "consistency" determination or a "negative" determination in September 2001.

41. Notwithstanding the explicit commitments set forth in the July 16, 2001, letters, the lessees learned that MMS would not issue any Section 307(c)(1) determinations, but instead would let months or years pass while it awaited a decision by the Ninth Circuit on its appeal of the district court's decision in *California v, Norton*.

42. On August 31, 2001, the Samedan sent a letter to MMS protesting this course of action. Samedan pointed out that the Government had not sought a stay of the district judge's order. Samedan also pointed out that the clear purpose of the directed suspensions contemplated by that order was to provide MMS with a limited period of time to make the Section 307(c)(l) determination, not to permit MMS to hold the Leases in abeyance indefinitely while appealing the court's decision. Samedan emphasized that, in light of the court's decision in *California v. Norton,* the 1990 Amendments to the CZMA, and their extension of the consistency review process to lease suspensions, had itself resulted in a significant delay to the operations. This was so because all milestone activities were ordered suspended pending completion of the Section

307(c)(1) process. Samedan objected to the considerable additional delay that would result from MMS' decision not to commence that process or issue a Section 307(c)(1) determination pending the resolution of the Government's appeal. It noted that "if MMS were to determine to postpone issuance of the [Section 307](c)(l) determination until after the appeals process, the operators would likely be prevented from exploring and/or developing their leases for an additional two years or more. That delay would result regardless of the outcome of the appeal." Samedan "urge[d] MMS to issue the [Section 307](c)(1) determination expeditiously."

43. On September 17, 2001, MMS responded that its attorneys were "working to determine the course of action which will best serve all constituents, including the lessees, the States and the public." Samedan objected by letter on September 21, 2001, pointing out that the district court's "decision leaves MMS no choice but to promptly file a CZMA determination." MMS has not responded to this letter, issued its Section 307(c)(l) determination, or indicated if and when it will do so.

44. "Contract law expresses no view about the wisdom of [the government's action]"; the court "examine[s] only that [action's] consistency with the promises that the . . . contract[s] contained." *Mobil Oil,* 530 U.S. at 624. The Government commits a material breach of OCS leases if it fails to carry out its contractual obligations in a "timely and fair" manner or if, in processing the lessees' request for a necessary governmental approval, it "deviates significantly" from the "procedures and standards" in effect when the leases were issued in a manner that results in a "substantial" delay in or interference with the lessees' exploration and development of the leases. *Id.* at 620-2 1.

45. A post-leasing law that expressly states that the Government intends to deviate significantly from the existing "procedures and standards" so as to cause a material delay to the

lessees' operations "amount[s] to a repudiation of the contracts." *Id.* at 612, 621. *See also id.* at 608 ("a 'repudiation' is a statement by the obligor to the obligee indicating that the obligor will commit a breach. . . .") (citation and quotation omitted). In *Mobil Oil*, the OBPA constituted such an anticipatory repudiation because it "did not announce an (OBPA-required) approval delay of a few days or weeks, but of 13 months minimum, and likely much longer. . . . And lengthy delays matter, particularly where several successive agency approvals are at stake." *Id.*

46. The 1990 CZMA Amendments did not clearly communicate the Government's intent to deviate significantly from the existing procedures and standards so as to materially delay or interfere with the Gato Canyon lessees' operations. The plain language of the 1990 CZMA Amendments did not subject lease suspensions to the CZMA Section 307(c)(1) process. When the 1990 Amendments were enacted, neither the Government nor the lessees believed that the Amendments had such an effect, or that the Amendments would have any impact on the lessees' right to obtain lease suspensions.

47. Even if the 1990 Amendments had clearly stated that future OCS lease suspension requests would be subject to the CZMA Section 307(c)(1) process and, as a result, operations under the OCS leases would be substantially delayed and potentially completely barred, the Amendments would have amounted, at most, to an anticipatory repudiation, pending actual application of the amendments to particular lessees. Moreover, to the extent that the application of the CZMA to the lease suspensions depended upon the milestones incorporated into the suspensions, no actual breach could have occurred until those milestones were established by MMS.

48. The June 2001 application of the 1990 CZMA amendments to require the Government to make a Section 307(c)(l) determination prior to granting the November 1999

suspension requests, and the delay to the operations under the Leases that has now resulted, constituted a significant deviation from the "procedures and standards" in effect when the Leases were issued. As a result, the United States has failed to afford lessees the "timely" and "fair" review of their lease suspension requests, and has caused significant, continuing and material delay to the lessees' exploratory and development operations.

49. The Government has caused additional significant, continuing and material delay to the lessees' operations by refusing to issue a Section 307(c)(l) determination pending the resolution of its appeal of the *California v. Norton* decision.

**COUNT I**
**(Breach of Contract)**

50. The allegations contained in paragraphs 1 through 49 are incorporated herein by reference.

51. Nycal as lessee has complied in all material respects with its obligations under the Leases issued by the United States.

52. The United States as Lessor has committed an anticipatory repudiation, anticipatory breach, repudiation, and/or material breach of its lease obligations, and of its implied duty of good faith and implied duty not to hinder the operations of Nycal or the other lessees.'

53. The United States' anticipatory repudiation, anticipatory breach, repudiation and/or material breach entitles Nycal, as lessee, at its option, either to restitutionary damages, reliance damages, or expectations damages equal to the profits that Nycal would have earned from the development of the Leases had the Government not committed an anticipatory repudiation, anticipatory breach, repudiation and/or material breach.

WHEREFORE, Nycal prays that the Court

(1) enter judgment against the United States in an amount equal to Nycal's restitutionary, reliance or expectation damages, whichever is greater;

(2) grant such other and further relief as the Court deems just.

Respectfully submitted,

Jeffrey D. Antonson
(Attorney of Record)
Robert J. Garrey
(of counsel)
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 953-6000
Telecopier - (214) 953-5822

ATTORNEYS FOR NYCAL OFFSHORE DEVELOPMENT CORPORATION

Dated: February 24, 2005.